## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

ROBERT PEACHER,

        Petitioner,

        v.                                         CAUSE NO.: 3:23-CV-1106-TLS-JEM

WARDEN,

        Respondent.

### OPINION AND ORDER

Robert Peacher, a prisoner without a lawyer, filed a habeas corpus petition under 28 U.S.C. § 2254 to challenge his conviction for attempted rape, criminal deviate conduct, and criminal confinement under Case No. 49G01-9508-CF-121394. Following a jury trial, on January 9, 1998, the Marion Superior Court sentenced him to 141 years of incarceration. ECF No. 24-1 at 25.

In deciding this habeas petition, the Court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Indiana Court of Appeals summarized the evidence presented at trial:

> At approximately 5:30 a.m. on August 25, 1995, the victim was driving to her job at Castleton Square Mall in Indianapolis. She was to meet with a group of coworkers and travel to another city for training. While waiting at a stoplight to turn into the mall parking lot, she noticed Peacher driving a damaged Ford Escort, also waiting to make the same turn. The victim turned into the parking lot and proceeded to the designated employee parking area to wait on her coworkers.
>
> As she waited in her car, she noticed Peacher driving back and forth in the parking lot. When she had not seen Peacher's car for a period of time, she got out of her car to retrieve some items from the trunk. After she got back into her car, her car door opened suddenly and Peacher, who was wearing a nylon stocking over his face, forced a red cloth over her face, partially covering her eyes. He then got into the back seat of the car and instructed her to drive. The victim felt a knife at her throat. Peacher threatened to kill her if she did not comply with his demands.

While attempting to drive where Peacher demanded, the victim struck a curb and the car stopped. Peacher then forced the victim out of her car and, still holding a knife to her throat, led her to an area against a building. He ordered her to take off her shoes, socks and panties. After she complied, Peacher tied her hands behind her back with a black nylon strap. While pushing the victim against the building, Peacher placed his fingers in her vagina. The victim heard something metallic hit the pavement and a crumpling noise, like the sound of a condom wrapper being ripped open. The victim saw a mall security vehicle in the reflection of the windows of the building against which she was forced. She worked her hands free and ran toward the security vehicle. Peacher ran in the opposite direction.

The victim was able to give police a description of Peacher. After a radio dispatch was made, an officer of the Fishers Police Department saw Peacher's vehicle and made a traffic stop. As the officer approached Peacher's vehicle on foot, Peacher drove off. After a short chase, Peacher was apprehended and placed in the police car. Police found a nylon stocking, a red cloth, a kitchen knife and an empty condom wrapper in the Ford Escort. Another condom wrapper was later found in the police car in which Peacher had been sitting. The Ford Escort also contained a black gym bag that did not have a strap. Peacher was taken back to the scene, where he was identified by the victim.

After Peacher was found guilty of all charges, he was sentenced to the maximum term of 50 years on each of the counts of Attempted Rape and Criminal Deviate Conduct; the maximum of 20 years on each of the two counts of Confinement; and the maximum of one year on the count of Resisting Law Enforcement. These sentences were ordered to be served consecutively and totaled 141 years.

ECF No. 24-5 at 2–4.

In the petition, Peacher asserts that he is entitled to habeas relief because the prosecution knowingly presented the perjured testimony of the victim and failed to disclose a transcript of the police interview of the security guard who first assisted the victim. Peacher also acknowledges that his claims are untimely and procedurally defaulted but asserts equitable tolling and actual innocence as an excuse to these procedural deficiencies. As newly discovered evidence, he presents an affidavit from the victim recanting her accusations against him and a transcript of the police interview of the security guard who first assisted the victim. Ultimately, this case turns on whether this evidence is sufficiently reliable and exculpatory to satisfy the demanding actual

innocence set forth in *Schlup v Delo*, 513 U.S. 298 (1995). Consequently, for purposes of judicial economy, this opinion will largely assume that the claims are timely and that Peacher submitted this new evidence in good faith. The opinion will instead primarily focus on whether this evidence—or evidence that Peacher could conceivably present at an evidentiary hearing—would satisfy *Schlup* as necessary to excuse procedural default.

## PROCEDURAL DEFAULT

Before considering the merits of a habeas petition, the Court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Benik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, "require[] the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (cleaned up). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.*

Peacher did not present his claims on direct appeal or on post-conviction review. ECF Nos. 24-3, 24-7, 24-12. Peacher attempted to present his claims to the Indiana courts by seeking authorization to pursue a successive petition for post-conviction relief, but the Indiana Court of

Appeals summarily denied his request. ECF Nos. 24-18, 24-19, 24-20. Therefore, his claims are

procedurally defaulted. However, as mentioned above, Peacher asserts actual innocence as an

excuse to procedural default.

ACTUAL INNOCENCE

A habeas petitioner can overcome a procedural default by establishing that the Court's

refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House*

*v. Bell*, 547 U.S. 518, 536 (2006). To meet this exception, the petitioner must establish that "a

constitutional violation has probably resulted in the conviction of one who is actually innocent of

the crime." *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995). "[P]risoners asserting innocence as a

gateway to defaulted claims must establish that, in light of new evidence, it is more likely than

not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."

*House*, 547 U.S. at 536–37 (cleaned up). In this context, the Court may consider evidence only if

it is reliable and was not presented at trial. *Gladney v. Pollard*, 799 F.3d 889, 898 (7th Cir.

2015). "The reviewing court then considers the total record—all the evidence, old and new,

incriminatory and exculpatory—and makes a probabilistic determination about what reasonable,

properly instructed jurors would do." *Id.* at 896 (cleaned up). "It is not the role of the court to

make an independent factual determination about what likely occurred, but rather to assess the

likely impact of the evidence on reasonable jurors." *Id.* (cleaned up).

Because the actual innocence standard requires consideration of the record in its totality,

the Court will first recount the evidence adduced at trial. At trial, Peacher faced charges of

attempted rape, criminal deviate conduct, two counts of confinement, and resisting law

enforcement in connection with events near the Castleton Square Mall in Indianapolis on August

4

25, 1995. ECF No. 27-1 at 187–88. Trial proceedings commenced on October 20, 1997. ECF No. 27-2 at 63.

The prosecution presented the victim who testified that, on August 25, 1995, she worked as an electronics consultant at the Lazarus Department Store. *Id.* at 203–35. At her supervisor's direction, she planned to meet coworkers in the parking lot at 5:30 a.m. and to then drive together to a training conference in Cincinnati. *Id.* As she pulled into the mall parking lot, she noticed a black individual with a box haircut dressed in dark clothing in a dark beat up Ford Escort, which struck her as unusual due to the time of day. *Id.* She nervously watched the Ford Escort drive back and forth in the parking lot. *Id.* Eventually, the Ford Escort left her view, and she felt comfortable enough to leave her car and rifle through her trunk to find music CDs. *Id.* When she got back into her car, her door flew open, and she saw an individual with a stocking over his face and a red rag smelling of gasoline and oil cover her nose and partially cover her eyes. *Id.* The individual sat in the seat behind her and ordered her to drive. *Id.* She complied with the red rag partially covering her face, with a knife at her neck, and with the individual threatening to kill her. *Id.* Eventually, she stopped her vehicle at a curb near the mall. *Id.* The individual ordered her to grab her purse and keys and pulled her out of the vehicle keeping the knife at her neck or head. *Id.* He forced her against the exterior wall of a building near a recessed corner, order her not to look at him, and threatened to kill her if she screamed. *Id.* She also observed that he wore gloves. *Id.* He stood behind her and ordered her to take of her shoes, socks, and panties at knifepoint. *Id.* After removing her panties, he ordered her to put her hands behind her back, and he bound them with a strap. *Id.* He then inserted a finger in her vagina. *Id.* She heard a ting sound, which she understood as him dropping the knife, and heard him remove a condom from his pocket and unwrap it. *Id.* During this time, she could see the parking lot

reflected in the building windows. *Id.* When she saw a security vehicle, she worked her hands

free from the strap and ran towards the security vehicle, screaming to call 911 and that she had

been attacked. *Id.* Before she could reach the security vehicle, another security officer directed

her to the employee entrance. *Id.* She saw the individual running in the opposite direction. *Id.*

The victim called 911, and the police arrived within minutes. *Id.* She described her

attacker's physical description and vehicle to the police. *Id.* At trial, she identified the knife, the

gloves, the red rag, the strap that bound her hands, and the nylon that was used as a face mask.

*Id.* Later on the day of the assault, she identified an individual apprehended by the police at

another location as her attacker. *Id.* She had never seen the individual before the attack. *Id.* She

also went to the hospital for a rape examination. *Id.*[1] She further testified that she had given her

account at a police interview and at a deposition conducted by trial counsel. *Id.*[2] The deposition

transcript, which was substantially consistent with her testimony, was admitted into evidence and

included the victim's testimony that she went to bed at 8:00 p.m. on the prior day. ECF No. 27-3

at 27–69. In the deposition, she also testified that she had intended to drive her car with her

coworker to a training conference in Cincinnati and arrive at 7:30 a.m. *Id.*

At trial, James Enoch testified that he worked as a crime scene specialist for Marion

County. *Id.* at 80–101. He collected a black cloth strap from a recessed corner of the mall. *Id.* He

also went to a different location and collected a knife from a Ford Escort. *Id.* He also collected

fingerprints from the knife. *Id.* The prosecution presented Michael Flannery as a fingerprint print

expert, and he testified that he found Peacher's fingerprints on the knife found in his car. *Id.* at

103–13.

---

[1] The Court has reviewed the medical report and finds that the victim's narrative is substantially consistent with her trial testimony. ECF No. 27-3 at 213–24.

[2] The Court has reviewed the transcript of the victim's police interview and finds that it is substantially consistent with her trial testimony. ECF No. 32-1 at 100–16.

Monte Bevard testified that he worked as a maintenance man at the Castleton Square Mall. *Id.* at 114–18. Sometime between 5:30 a.m. and 6:00 a.m., he went outside and saw a Ford Escort parked in front of his truck near the curb. *Id.* As Bevard drove away, he saw a dark figure to his right walking quickly toward the Ford Escort. *Id.* He returned about fifteen minutes later, and the Ford Escort was gone. *Id.*

Deputy Sheriff Kidd testified that dispatch sent him to Castleton Square Mall at 5:41 a.m., and spoke with the victim, who provided a description of her attacker. *Id.* at 125–29. He later took her to another location to identify her attacker, which she did. *Id.* Deputy Sheriff Braun testified that he received a report that an attempted rape had occurred at the mall and that the suspect was a black male in a blue Escort. *Id.* at 131–52. He saw the Escort and Officer McFerran's police car stopped on the interstate entrance ramp. *Id.* As he approached, the Escort sped away, and he and Officer McFerran pursued it. *Id.* At some point, the Escort started smoking and stopped at an office park. *Id.* He ordered the driver out of the Escort and handcuffed him. *Id.* He found an empty condom wrapper and a nylon stocking in the driver's pocket, and he placed the wrapper back in the pocket. *Id.* At trial, he identified the driver as Peacher. *Id.* On the day of the assault, he placed Peacher in the back seat of his police car. *Id.* Later that afternoon, Detective Williams informed him that the condom wrapper was no longer in Peacher's pocket. *Id.* Deputy Braun searched his police car and found the wrapper in a wooden box that was accessible to Peacher as he sat in the backseat. *Id.*

Officer McFerran testified that he located a black male driving a Ford Escort in traffic and stopped it on the interstate entrance ramp. *Id.* at 191–98. As he exited his police car, the Escort drove off, and he pursued it. *Id.* He withdrew from the pursuit once law enforcement from Marion County had joined. *Id.*

Detective Williams testified that, at about 6:35 a.m., she went to the traffic stop location. *Id.* at 155–80, 209–11. She collected a pair of dark work gloves, pantyhose, a red shop rag, and a black gym bag without a strap. *Id.* She also observed a knife in the Escort but left it for the crime scene technician to collect and examine for fingerprints. *Id.*[3] Through her investigation, she discovered that Peacher worked at a Shell gas station. *Id.*

At sentencing, the victim testified as follows:

**Prosecution:** Did you know Mr. Peacher prior to the incident?

**Victim:** Certainly not.

**Prosecution:** Would you like to tell the Court how the attempted rape, criminal deviate conduct charges, all the charges that he was convicted of have affected your life?

**Victim:** It's kind of hard to even describe to someone whose not been through something like this, how it would affect your life and give them any kind of understanding at all. I was treated for post-traumatic s disorder and severe insomnia and medicated as a result of this. I became detached completely from anything of any value that had been of value to my life prior to that. I couldn't possibly continue working at that job. It was a job that I enjoyed very much prior to this incident.

**Prosecution:** Is that because that was at the location where the attack occurred?

---

[3] Trial counsel objected under *Miranda v. Arizona*, 440 U.S. 934 (1996), to the admission of Peacher's initial remark to Detective Williams in response to her saying, "Good morning, what's up?" ECF No. 27-3 at 180–90, 204–08. Outside of the presence of the jury, Detective Williams testified that she had a preexisting relationship with Peacher and that he responded, "All you have are my work gloves and rag, and my hair cap. She didn't see my face." *Id.* Though the trial court suggested that it was inclined to admit the remark based on its legal research, the prosecution ultimately declined to offer this remark into evidence as part of the case-in-chief but indicated that they would offer it if Peacher took the witness stand. *Id.*

It strikes the Court as unlikely that *Miranda* would have required the exclusion of Peacher's remark. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."). In any event, the prosecution could use this remark to impeach Peacher if he offered testimony consistent with the version of events in his federal habeas filings at a hearing or new trial. *See Winsett v. Washington*, 130 F.3d 269, 277 (7th Cir. 1997) ("[P]rosecutors could nevertheless use the statement as impeachment material unless it was involuntary under the Fifth Amendment."). As a result, the Court will consider the statement in assessing whether Peacher has satisfied the actual innocence standard.

**Victim:** That's correct. Yes. I went through a great deal of counseling and struggle. And to this day still do struggle with trying to repair the damage that was caused by this person. I have recurring nightmares. As I'm running away that day, he [shoots] me in the back, I fall down, I feel the blood, I feel the heat of the bullet, and I know I'm dead. That's just a small, small portion of what I've experienced as a result of what this person did to me.

**Prosecution:** Would you like to talk to the court about what kind of recommendation you think you would give as far as the sentencing goes?

**Victim:** What we're dealing with is obviously a situation of a person who enjoys committing heinous sex acts against innocent women. And something—there's a part of me that he's taken away that I will never ever get back as long as I live. This is not someone who has any ability for reform. He's shown that by past history. The complete denial and lack of remorse that he has shown following this incident, I think, would also lead someone to believe that there is no ability for reform of this person. And I think that the only thing that can be done that would be appropriate would be to give this person the maximum sentence allowed by law on every charge. I—as part of the healing process have learned to forgive. But I feel it's my duty to do everything I can to see this man stays behind bars so that he can't trash other women's lives.

**Prosecution:** Is there anything else that you would like to say to the Court? This is your opportunity if you—if you have anything else you'd like to say.

**Victim:** As far as death threats and the phone calls, I was completely terrified. And I—had he been successful, you—you—it could be that he would be involved in a murder trial. I—I—I've also wanted an opportunity to make a statement to the Defendant directly.

**Trial Court:** The Court will allow you to do that.

**Victim:** You, Robert Peacher, will have to understand I have forgiven him, I will heal and I will go on. But for every action, there's an opposite and equal reaction. You will suffer eternal damnation for heinous sex crimes you've committed against women. You may be in denial of what you've done but there will come a time where you'll face your Maker and you will meet what you have done. You may have ripped apart a part of my life that I will never get back. But you will meet—you will meet the appropriate punishment for what you have done at some point in time. Do not think because you are in denial that you can escape. Imprisoning you will be no just punishment for what you have done, even if you are in prison for the rest of your life. All it will do is keep other women safe. However, the only way I've been able to forgive is because I know you will get your just punishment. On the totem pole as far as felons go, I—my understanding is that rapists are considered amongst the lowest. For obvious reasons. While you're sitting there and you have all that time in prison I hope to God that you

think about what you've done and you know the pride I take in the fact that I was able to follow through and put you there. And that's all I have to say.

ECF No. 27-4 at 90–93. Trial counsel sought a minimum aggregate sentence of thirty years. *Id.* at 100–02.

At the post-conviction stage, on July 15, 2003, the State submitted an undated affidavit from the victim attesting as follows:

1. I never signed an affidavit recanting my trial testimony in this Cause or exonerating Robert Peacher of the crimes he committed against me.

2. I never met Robert Peacher before he attacked me on August 25, 1995.

ECF No. 27-11 at 66.

The Court now recounts the new evidence offered by Peacher. The first category of new evidence pertains to the recantation of the victim. According to Peacher, an individual named Cathy Ford assisted him by repeatedly calling the victim to solicit her recantation. He provides an unofficial transcript of a telephone conversation between the victim and Cathy Ford occurring on December 6, 2021. ECF No. 32-1 at 32–45. According to the transcript, the victim initially offered the same version of events as she did at trial, but she eventually recanted as follows:

**Cathy Ford:** Please forgive me, but that makes no sense to me. There is no way you could identify him in that manner if you did not know him. Additionally, if the attack happened that way, how is it that you did not spill one drop of coffee on yourself or in your car? It is impossible[.] Would you please just tell me the truth? It's been over twenty years now. There's really nothing that can be done to you.

**Victim:** Oh really? What about perjury charges?

**Cathy Ford:** Perjury? [D]oes that mean you lied on Robert Peacher?

**Victim:** Yes . . . I lied. He didn't attack me.

**Cathy Ford:** Will you please tell me what really happened that night?

**Victim:** When we left the bar I drove to the gas station where I bought coffee to sober up. He stayed in the car.

**Cathy Ford:** So wait. So you two were at a bar together that night?

**Victim:** I was at a bar when I met him for the first time. He was young, big and was flattering me. We were together the rest of the night and planned to continue the night away from the bar, but to do that I had to let the co-workers who I was going to carpool with that morning know I would drive myself so I needed to go to my job at Lazarus in Castleton and leave a message. He was with some friends, so he left his keys with them to go get their cars and told them where to drop his car off. We stopped at his car for a second where he showed me some stuff about his new business and his part-time job. We then left in my car and drove to a gas station to get coffee so you couldn't smell the alcohol and to sober up a little. When we got to Castleton, Robert and I made out in the car for a few minutes before driving up to the Lazarus entrance. I got out, but after knocking on the door a few times, Robert got out and joined me to wait for the security guard. That's when we began making out again.

**Cathy Ford:** So what about the knife and stocking over his face. Where did that come from?

**Victim:** He used those things at the gas station where he worked at night so he could do his business in the day. He showed me those things before we left the bar.

**Cathy Ford:** So, he didn't use them on you?

**Victim:** No.

**Cathy Ford:** That explains why no coffee was spilt when it had no lid.

**Victim:** Yes.

**Cathy Ford:** So what happened as you two made out?

**Victim:** We got carried away and when I heard the security or police car moving slow and taking a look, we tried hiding, but I panicked about my job and took off running to my car. I didn't realize the Lazarus guard had finally come outside and when I saw him I freaked out and said I was being attacked.

**Cathy Ford:** Did you see where Robert went?

**Victim:** No.

**Cathy Ford:** So you knew from the beginning you were with Robert Peacher?

**Victim:** Yes.

11

**Cathy Ford:** I want to be sure I understand you. Are you saying Robert Peacher did or did not attack you?

**Victim:** He never attacked me. He never attempted to rape me. I panicked about my job when I thought we were caught in stages of undress.

**Cathy Ford:** Well, why did you still come to court if you knew it was a lie?

**Victim:** I felt pressured by the detective.

**Cathy Ford:** Which detective?

**Victim:** I'd rather not say her name.

**Cathy Ford:** Okay. You did a deposition where you kept with the story?

**Victim:** Yes.

**Cathy Ford:** Then you testified at trial?

**Victim:** Yes.

**Cathy Ford:** Then when he tried to go back to court after being convicted a police detective witnessed you sign an affidavit saying you didn't rescind your trial testimony?

**Victim:** Yes.

**Cathy Ford:** So [your] trial testimony was a lie?

**Victim:** Yes.

**Cathy Ford:** So is he completely innocent?

**Victim:** Yes.

**Cathy Ford:** So why don't you just come forward now? Sign an affidavit or something? He has been suffering in jail all this time for a crime he never committed.

**Victim:** Don't you think I know that? But I've been told he's tried to have me harmed a couple of times and if he gets out he may want revenge for my lying on him and he being stuck in prison all that time.

**Cathy Ford:** Honestly, could you blame him for feeling upset for being locked up all this time for a crime he didn't commit?

**Victim:** No.

**Cathy Ford:** So because of that fear you would let an innocent man stay in jail?

**Victim:** If my life would be at risk, yes.

**Cathy Ford:** But, I understand your concern, but you should want to fix this wrong. Even if you're afraid.

**Victim:** Well . . .

**Cathy Ford:** What if he has no intention to come near you and is planning a life away from Indiana? Would you come forward and tell the truth?

**Victim:** There's no way you can be sure and if I signed an affidavit or testified at a hearing that he's innocent and that I lied on him, I can still be charged with perjury. I have a good life now.

**Cathy Ford:** But what about Robert's life?

**Victim:** I get it. He's suffering for no reason because he's innocent, but I'm not going to give up my life to fix the past of me lying on him. He shouldn't have been trying to cheat on his girlfriend.

**Cathy Ford:** Trying to cheat should not be a life sentence.

**Victim:** Well the circumstances turned out to be unfortunate.

**Cathy Ford:** So you'd rather let an innocent man stay in jail than face perjury charges where you will likely get probation?

**Victim:** You don't know what sentence I'll get. And if it means taking any risk to my freedom, I'll never testify, I'll never admit to it in court or by affidavit, and if I'm subpoenaed or forced into court to testify, I will stick with my life that Robert attempted to rape me.

**Cathy Ford:** If you admit it in an affidavit don't come to court. You could send him the affidavit and just leave things as is.

**Victim:** Well . . .

**Cathy Ford:** If you sign an affidavit in front of a notary then the rest would have to be up to him.

**Victim:** He could subpoena me or they could and I won't change my story if I have to get in front of a judge. I'll continue the lie.

**Cathy Ford:** I understand. I just want you to think about this. It's the holidays. Robert Peacher has been away from his family for at least two and a half decades. Maybe he has wanted revenge in the past, but he just wants to clear his name, move and spend time with his family. If you gave me permission, I could try to arrange an affidavit for you to sign.

**Victim:** I'm not giving you permission.

**Cathy Ford:** Well, I'll let you go to think about this. I appreciate your time. I really just hope you think about this.

**Victim:** Like I said, I don't give you permission.

**Cathy Ford:** I understand. Have a good evening.

*Id.* at 40–45.

On July 13, 2022, Peacher wrote the victim a letter and sent it to what appears to be her residential address. *Id.* at 30–31. It read as follows:

Before you possibly call the police, please read my letter first. I mean you no harm. I needed to write you and take this risk to ask you to do the right thing. Please read the letter first before throwing it away or contacting the police.

You and I both know what happened in 1995. I never attempted to rape you or harm you in any way. I know you know this because over the years you have admitted to people, but you refuse to tell anyone in law enforcement or the prosecutor's office. I have been told the reasons why you refuse and will deny admitting things if ever contracted by anyone from the prosecutor's office or the police, but I am asking for mercy. Please tell the truth! I cannot compensate you to tell the truth because it would either be illegal or unethical. I've been told by the people you've told to inform me to give you money to never compensate you because it will make things worse. I cannot give you anything financially.

What I can say is I've spent many years being bitter and angry about you lying on me. Yes, I've wanted revenge but it's just eaten me up. Today, the anger is gone. It's doing nothing but kill me. I just want to clear my name, be released, and get on with life. I want to have a family. I can tell you that I will be leaving Indiana as soon as financially prepared which will not take long. I will not come near you. If you want to file a restraining order, fine. I have no intent of doing anything to come back to jail. I just want you to tell the truth and set me free.

14

Last year I know people were contacting you to discuss me. They were volunteers trying to help find evidence and clear my name. I know in December last year you finally spoke to one of my volunteers. I know you admitted to her that I did not attempt to rape you. There is something you may have expected but also likely did not know: 1) You may have thought or expected that the phone call was recorded, but didn't care because you didn't consent to any recording and you weren't asked for permission to be recorded; but 2) what you likely did not know (I didn't) is that Indiana is what they call a one party state. This means that only one person on the phone needs to know the call is being recorded and it can be used as evidence. I'm sure you do not believe me, but it's true. You need to check it out. I now have evidence of you admitting you lied with witnesses.

I know if you are approached by the prosecutor or police or forced to go to court, you will deny ever admitting you lied on me, but I am asking you to reconsider. I am enclosing a copy of the 14-page transcript of that phone call between you and my volunteer on December 6, 2021. Please read it and see that I'm not lying about knowing and please ask someone if I'm telling the truth about this being a one-party state and that your conversation is admissible.

I am not trying to disrupt your life. I'm just trying to have/get mine back. I'm having some serious health problems and I do not wish to die in prison for a crime I never committed. I am doing everything I can to get back into court. The way I'm doing it will require you to come to court. I do not wish you harm. Would you please consider creating an affidavit, having it notarized and sending it to me? I just want you to tell the truth. I will not call you to court because I know you'll deny everything. I cannot do anything about the prosecutor, but I'll pray they just leave you alone so you don't deny the truth.

There is someone in my life I love very much. We're both suffering being separated. I just want to move on with my life with her. Please consider finally doing the right thing so my wrongful conviction and sentence can be reversed and me free. God bless, and please don't punish me for contacting you.

*Id.*

According to Peacher, on August 23, 2022, the victim wrote a letter to Peacher, stating as

follows:

I received your July 13th letter. I am only going to address the main issue in the letter. I did check and learn about the one-party state issue and unfortunately you are correct. I am bothered and concerned by what that will mean for me.

I am providing you with what you are basically demanding. I have enclosed it with this letter. I am going to seek that order when things go your way. I do not

15

want anyone else contacting me. I will deny it all and stay with my original story if "those" people contact me. Any disruption to my life is something I will not accept so use what I am providing you to take care of your affairs. This is the last time I'll write or have anyone try to communicate with you and do not wish to speak with any more of your attorneys. They have not been cooperative over the years to any requirements I have asked and were it not for this one party state issue we would not be doing this now.

*Id.* at 27.

The enclosed affidavit read as follows:

2. I met Robert Peacher August 24, 1995 inside a bar at Keystone at the Crossing. He introduced himself and offered to buy me a drink which I accepted.

3. We continued our interaction into the morning of August 25, 1995. We decided to spend the night together. To do this I had to leave a message at my job at Lazarus Dept. Store in Castleton Square Mall informing some co-workers to not wait for me to car-pool for a work trip, and he had to leave his car with bar friends to accompany me. I drove us to the mall to leave the message so we could continue our night.

4. When we arrived I drank my coffee and we talked. We were only supposed to sit in the parking lot briefly but nearly 2 hours passed as we became intimate in the car.

5. Eventually I drove my car and parked in the front of the store entrance and got out to leave my message with the store security guard. While waiting, Robert got out of my car joined me at the entrance door and began kissing me. We became intimate on the side of the building.

6. Within minutes I heard an automobile. It startled me and we tried hiding in the shadows of the building but I thought we had been seen and ran toward my car.

7. As I ran I encountered the store security guard walking out of the building. In a panic of being caught in the compromising situation I screamed call the police. He secured me in the building and called them.

8. I then began thinking of how to explain why Robert and me were being intimate believing we had been seen. I lied to authorities asserting Robert attempted to rape me and that I did not know him. I omitted and lied about being out that night and meeting him in a bar.

9. Before trial, I was at some point informed Robert wanted to harm me so I continued with my life and testified in court he attempted to rape me out of fear and pressure.

10. I have admitted to some people in years past the trust that Robert did not attempt to rape me and that everything was consensual. On December 6, 2021, a woman calling herself Cathy Ford, called me for maybe the 5th time wanting to discuss Robert and the August 1995 events. So she would stop calling I finally spoke with her and eventually admitted he did not attempt to rape me. I was unaware she was recording the call or that it was legal to do so without my consent.

11. On July 16, 2022, I received a letter from Robert (see attached letter). Accompanying the letter was a transcript of the December 6, 2021 phone call between me and Cathy Ford (see attached). While I do not remember all the words from the conversation, I am admitting the transcript appears accurate.

12. Robert Peacher did not attempt to rape me August 25, 1995. I was a willing participant. I lied on him because I thought we had been seen in a compromising position that would affect my job. I was afraid of losing my job or being arrested for being exposed in public.

13. I will not talk to the authorities, police or prosecutor, nor will I appear in court regarding this. If contacted by anyone else or required to attend court I will deny everything under oath. My life is good and I want to be left alone.

14. If Robert cannot resolve his situation with this affidavit it is not my problem because this affidavit is the extent of my effort to be involved.

*Id.* at 91–92.

The second category of new evidence offered by Peacher involves the narrative of the security guard who first encountered the victim following the attempted rape. Peacher has offered an unsigned letter, dated December 19, 2022, from an unidentified person. The handwritten letter reads as follows:

Dear Mr. Peacher,

Enclosed is a 1995 witness statement withheld from you. Your CIU application and most recent letter reminded me of coming across the statement. Along with the statement was an affidavit from someone else who discovered the statement, and additional notes in a file I thought accidently mislabeled, but determined the mislabeling was deliberate to conceal the statement.

This statement can exonerate you. It is a *Brady* violation warranting, at minimum, a new trial. The notes identify people who withheld this evidence. I know some of

17

them and I've struggled with the decision to send you this information. You are owed the evidence to free yourself of the wrongful conviction, but it will be seen as an act of betrayal if I identified the people I know took part in this. For this reason, I am not identifying myself.

You need to immediately contact Kelly Bauder or Jessica Cicchini from the Conviction Integrity Unit. They can move to have you released or at least placed on home detention, within a month, while your case review is completed. Good luck to you.

*Id.* at 59.

The enclosed witness statement was an unofficial, unsigned transcript of Detective Williams' interview with the security guard who first encountered the victim following the attempted rape. *Id.* at 60–65. The identifying information of interviewee, including his or her name has been redacted. *Id.* The interview was conducted on September 14, 1995, and reads as follows:

**Detective Williams:** Okay, would you please give me your full name and spell your last name?

**Unidentified Individual:** [redacted in transcript]

**Detective Williams:** And your age?

**Unidentified Individual:** [redacted in transcript]

**Detective Williams:** And what is your current address?

**Unidentified Individual:** [redacted in transcript]

**Detective Williams:** And your work number?

**Unidentified Individual:** [redacted in transcript]

**Detective Williams:** And your home number?

**Unidentified Individual:** [redacted in transcript]

**Detective Williams:** Okay, where do you currently work?

**Unidentified Individual:** At Lazarus department store at Castleton Square Mall[.]

**Detective Williams:** And what do you do for work?

**Unidentified Individual:** I am a security guard for Lazarus on the night shift.

**Detective Williams:** Okay, so you were working the night of August twenty fourth and the morning August twenty fifth?

**Unidentified Individual:** Yes[.]

**Detective Williams:** Okay, and something happened that morning at . . . First, what were you doing prior to the incident this morning at the mall?

**Unidentified Individual:** I was making rounds inside the store and maintaining security.

**Detective Williams:** Okay, and do you have a normal routine when making your rounds?

**Unidentified Individual:** There is no specific way I must take the rounds, but I have a routine.

**Detective Williams:** Okay, so lets turn to the incident this morning. What time did you notice the red car in the fire lane?

**Unidentified Individual:** Well, I first saw the car sitting in the parking lot around four fifteen, but didn't see it in the fire lane until about five thirty.

**Detective Williams:** You saw the car at four fifteen in the parking lot? The same car that you saw in the fire lane at five thirty?

**Unidentified Individual:** Yes. I was checking the entrance doors around four fifteen and saw the red car in the parking lot[.]

**Detective Williams:** How far was the car from [where] you parked in the lot?

**Unidentified Individual:** Well, approximately thirty feet or so from the door entrance.

**Detective Williams:** Okay, was it in a parking space?

**Unidentified Individual:** Yes.

**Detective Williams:** Okay, could you see if anyone was in the car at that time?

**Unidentified Individual:** I could see there were two people in the front seats.

**Detective Williams:** Where did those people appear in the car?

**Unidentified Individual:** Sorry?

**Detective Williams:** Were the people you saw in both front seats or was one in the front seat and one in the back seat?

**Unidentified Individual:** I could see the shape of a woman in the driver's seat and a man in the passenger seat. I don't believe there was anyone in the backseat. It was just a 2 door car.

**Detective Williams:** Okay, so, could you determine what they looked like?

**Unidentified Individual:** Not at that time, but I did see them later and know the woman was white and the man was black[.]

**Detective Williams:** Okay, so you did not see anyone in the backseat and you only saw two people?

**Unidentified Individual:** Correct. Noone in the backseat and there were only two people in the car[.]

**Detective Williams:** And are you sure the car you saw at four fifteen sitting in the parking lot is the same car you saw at five thirty in the fire lane?

**Unidentified Individual:** I am positive. It was the same two door red hatchback.

**Detective Williams:** And if someone said the red car did not arrive in the parking lot until approximately five twenty, they would be incorrect?

**Unidentified Individual:** Yes, they would be wrong. The car was sitting in the parking lot as early as four fifteen because that's when I first saw the car[.]

**Detective Williams:** Okay, uh...So after you saw people were sitting in the car, did you take any actions?

**Unidentified Individual:** No, I didn't see anything that raised suspicion. It just looked like two people talking in the car or something[.]

**Detective Williams:** And you thought it was normal for people to be sitting in the parking lot at four in the morning like that?

**Unidentified Individual:** Well, not necessarily normal, but not so unusual for me to be concerned.

**Detective Williams:** Okay, so at four fifteen you could not identify the people in the car?

**Unidentified Individual:** Not at that time, but I saw them later.

**Detective Williams:** Okay so you saw one of them or both later? Let's back up. After you saw the car and the people in it, what did you do next?

**Unidentified Individual:** I made a mental note of the car and went back to making my rounds.

**Detective Williams:** Okay, and you said you saw them again. Or both of them?

**Unidentified Individual:** Both.

**Detective Williams:** Okay, when did you see them?

**Unidentified Individual:** It was about five thirty. I was making my rounds and I could see the east entrance door from back inside the store. I saw the car was near the entrance door now and that's when I saw them.

**Detective Williams:** And you saw them in or out of the car?

**Unidentified Individual:** Both.

**Detective Williams:** Okay, can you explain what you mean by both.

**Unidentified Individual:** I heard banging on the door. When I looked I saw a woman at the entrance door with her hands cuffed[4] trying to look in the store and I saw a man still in the car's passenger seat[.]

**Detective Williams:** Okay, you said you heard banging, did that cause concern for you?

**Unidentified Individual:** No, but because I saw her while making my rounds and heard her banging on the door I did pick up the pace a little so I could get to the door sooner[.]

**Detective Williams:** Okay, so it was just her at the door?

---

[4] According to Peacher, the unidentified individual is "[clearly] referring to [the victim] cuffing her hands as people do to try to look into a window that is reflective in order to see in the store." ECF No. 32 at 27.

**Unidentified Individual:** When I first glanced in the direction of the door I saw her at the door, but I saw the black man getting out of the passenger side of the car.

**Detective Williams:** You saw a black male exiting the passenger side of the car?

**Unidentified Individual:** Yes.

**Detective Williams:** The red two door car?

**Unidentified Individual:** Yes[.]

**Detective Williams:** The woman was not with him when he exited the car?

**Unidentified Individual:** No, like I said she was already at the door entrance. Before they were out of my sight as I made my walk through I saw him walk beside her and they put arms around each other.

**Detective Williams:** You saw them embrace?

**Unidentified Individual:** It wasn't like an embrace or hug. I just saw him place an arm around her shoulder and her move her arm around him[.]

**Detective Williams:** And you could see all of that?

**Unidentified Individual:** Yes, but then they were out of my sight when I went around a corner in the store[.]

**Detective Williams:** And you could see all of that?

**Unidentified Individual:** Yes, but then they were out of my sight when I went around a corner in the store[.]

**Detective Williams:** Okay, could you see if the man had a hat or anything obscuring his face?

**Unidentified Individual:** No. There was no hat or anything on his face. I couldn't make out facial features, but he was a dark skinned black man.

**Detective Williams:** Okay, could you describe them?

**Unidentified Individual:** Well, she was white, she was about five three and like I said he was black and around six feet, six one.

**Detective Williams:** Okay, so what did you do next?

**Unidentified Individual:** I continued my round. I heard them knock again so I sped up a little more.

**Detective Williams:** Okay, so how long from the first time you heard someone knocking at the entrance door did it take you to actually arrive at the entrance door?

**Unidentified Individual:** It wasn't long. Maybe a little over five minutes.

**Detective Williams:** Okay, when you arrived at the entrance door who did you see?

**Unidentified Individual:** Noone.

**Detective Williams:** Noone?

**Unidentified Individual:** There was noone there, but the car was still in the fire lane. I saw one of the security vehicles driving slowly passed the car so I began unlocking the doors to go outside to look around.

**Detective Williams:** Okay...

**Unidentified Individual:** I wanted to know where those two people went to. As I was going outside I heard a woman screaming for help[.]

**Detective Williams:** Okay, so you were inside when you heard the woman scream?

**Unidentified Individual:** No. I had just made it outside when I heard her scream.

**Detective Williams:** Okay, what did you do next?

**Unidentified Individual:** I turned to the right and saw her running toward me. I raised my voice asking her what was wrong with her. It was the same woman I had just seen at the door earlier with the black man.

**Detective Williams:** Okay.

**Unidentified Individual:** She was screaming call the police so I grabbed her, pulled her inside the building and locked the door. I asked her where her male companion was and she just kept screaming call the police.

**Detective Williams:** And did you call the police?

**Unidentified Individual:** Yes. I thought maybe she and her companion had gotten robbed or something. She was screaming and I no longer saw him.

**Detective Williams:** Okay, and did you do anything else?

**Unidentified Individual:** I stayed with her until police came but I contacted my bosses alerting them that something had happened. I asked her again if her companion was okay because I couldn't see him and didn't know if he was okay. She just kept saying call the police.

**Detective Williams:** Why do you keep calling the man her companion? Why do you believe he was her companion?

**Unidentified Individual:** The black man?

**Detective Williams:** Yes.

**Unidentified Individual:** Well, he was in the passenger seat of her car, he got out of the car, and I saw them put their arms around each other at the door and looked at each other.

**Detective Williams:** Okay, can you describe the man you saw her with with more detail?

**Unidentified Individual:** Well, like I said, he was dark skinned, about six feet, six one. He had on a black or dark colored tee, blue jeans. I guess average size; maybe two hundred pounds.

**Detective Williams:** And he had nothing on his head or over his face when he was with her?

**Unidentified Individual:** No.

*Id.*

The Court has carefully considered whether the new evidence satisfies the actual innocence standard or could satisfy the actual innocence standard with further development. The Court first observes that the victim's affidavit and the telephone conversation transcript constitute hearsay under Fed. R. Evid. 801(c). Given Peacher's unequivocal assurances to the victim that he would not try to call her as a witness, no hearsay exceptions would apply to render

24

such evidence admissible at a hearing.[5] *See* Fed. R. Evid. 803, 804. The Court further observes that the record contains significant evidence that the recantation was coerced to some degree, including multiple telephone calls by Cathy Ford and Peacher's reference to "people" contacting the victim, suggesting that others contacted her as well. According to Peacher, Cathy Ford and Peacher engaged in trickery by manipulating the victim into producing the affidavit by recording the telephone call without her knowledge or consent.

The victim also remained adamant for twenty-six years that Peacher had sexually assaulted her, including her police interview, pretrial deposition, trial testimony, sentencing testimony, and post-conviction attestations, up until halfway through the December 2021 telephone conversation. The victim's speech at sentencing, emotional and literally damning, seems particularly difficult to reconcile with her new narrative. Peacher and the victim also acknowledged that Peacher had sought revenge against her and had threatened her with violence in years past, and she further expressed fear for her life. Additionally, the victim indicated that she did not want to produce the affidavit and that she only did so due to the surreptitious recording, and she declared that she would not support her recantation going forward in any way.

Next, even assuming Peacher presented the unidentified individual and the victim at a hearing and that they testified consistent with this new evidence, the Court's concerns about the credibility of their joint narrative would remain. Specifically, the new evidence suggests that the victim was so concerned with losing her job at Lazarus due to being seen engaging in physical intimacy that she falsely accused Peacher of sexual assault and sought the maximum sentence against him. And according to Peacher, she did this while simultaneously suggesting that the

---

[5] Though Peacher suggested that the prosecution might call the victim as a witness at an evidentiary hearing, it is unclear what motivation the prosecution would have in seeking further testimony from the victim as opposed to relying on her prior testimony.

victim was so reckless that she purposefully drew attention to herself by knocking on the transparent door of her windowed workplace in view of those inside and outside the building and then engaged in physical intimacy at that very location. The purported motive for the false accusation is also undermined by the victim's testimony at sentencing that she never returned to this job after Peacher had sexually assaulted her.

Further, it is unclear why the victim would have wanted to go to her workplace before her coworkers had arrived to tell her coworkers that she would drive separately to a training conference in Cincinnati in order to spend more time with Peacher "away from the bar." Given that she had already planned to drive to Cincinnati and would have needed to wait for her coworkers to arrive in order to talk with them, this maneuver would have saved her no time. Similarly, it is unclear why the victim would have preferred to wait with Peacher in her workplace parking lot for more than one hour beginning at 4:15 a.m. rather than simply making a telephone call or leaving a note. It is also unclear why Peacher would have arranged for "bar friends" to drive his car to the same parking lot rather than having them drive it to his residence or simply driving it to the parking lot himself. Given these material inconsistencies, a juror could reasonably disbelieve this joint narrative without considering any other evidence.

Looking beyond internal inconsistencies, the record contains a substantial amount of other conflicting evidence. At this time, the record includes the victim's police interview, pretrial deposition, trial testimony, sentencing testimony, and post-conviction attestations, each of which materially contradict the two types of new evidence. In other words, the evidence on record, at best, amounts to a swearing match on which jurors could reasonably decide to convict Peacher. As explained by the Seventh Circuit:

> [The petitioner] contend[s] that the default should be excused to avoid a "fundamental miscarriage of justice"--which is to say, the conviction of an innocent

person. Factual innocence indeed relieves a petitioner of a procedural default, at least when the error affects the finding of guilt, as opposed to a non-capital sentence. Yet how could we conclude, in the statutory language, that "the facts underlying the claim . . . establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense"? Suppose that the six alibi witnesses had been called. That would at best have produced a draw: six eyewitnesses identify [the petitioner] as the culprit, six others exculpate him. That cannot establish that "no reasonable factfinder would have found the applicant guilty of the underlying offense"; it is black letter law that testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar.

*Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) (cleaned up); *see also Moore-El v. Luebbers*, 446 F.3d 890, 903 (8th Cir. 2006) ("The existence of such a 'swearing match' would not establish that no reasonable juror could have credited the testimony of the prosecution witnesses and found [the petitioner] guilty beyond a reasonable doubt."); *Bosley v. Cain*, 409 F.3d 657, 665 (5th Cir. 2005) ("At best, [the petitioner's] new evidence shows that a reasonable doubt could have been found to exist; it fails, however, to satisfy his burden of showing that no reasonable juror would have found him guilty. When we view all the evidence-both the new evidence and the evidence offered at trial-we are left with a classic swearing match.").

Additionally, the record contains incriminating evidence even setting aside the victim's testimonial statements against Peacher. For example, the new evidence does not account for the black strap found in the outside corner of the mall, Peacher's statement to Detective Williams following his arrest, and Peacher's efforts to evade the police and to hide the condom wrapper, indicating consciousness of guilt. Further, while the victim's recantation briefly addressed the butter knife and pantyhose, it remains entirely unclear as to how Peacher would have used these items in connection with his overnight job at a gas station, why he would have stored them in his vehicle rather than at the gas station, or why he would have showed them to a woman he had just met at a bar. Therefore, the Court concludes that Peacher has not adequately demonstrated a

claim of actual innocence and could not do so even if granted the opportunity to conduct discovery and to present evidence at a hearing.

CAUSE AND PREJUDICE

Peacher may also be asserting that the prosecution's failure to disclose the interview of the unidentified security guard serves an excuse to procedural default. A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure. *Wainwright v. Sykes*, 433 U.S. 72, 90–91 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 492 (1986).

Here, the Court finds that the interview transcript is not merely difficult to credit but that it is an obvious forgery. To start, the letter accompanying the interview transcript is extremely suspicious. It is vague, handwritten, and unsigned with the author refusing to identify himself or herself, while also dated, written on the Marion County Prosecutor's letterhead, and sent in a Marion County Prosecutor's envelope with Peacher's handwritten address. It makes little sense that an individual would use his or her own handwriting with such strong signs that he or she was one of a limited number of employees in the prosecutor's office given the purported anonymity-related concerns and given the author's likely familiarity with criminal investigative techniques. It is similarly unclear why such an individual would not have assisted Peacher further by identifying the security guard and by sending the related notes and affidavit or, at minimum, providing a clearer explanation of their contents. Further, Kelly Bauder, co-director of the

28

Conviction Integrity Unit, has attested that none of her staff members wrote the letter or Peacher's address on the envelope. ECF No. 24-21.

Moreover, though Peacher maintains that the interview transcript is legitimate based on comparisons of other transcripts of police interviews in his criminal case, ECF No. 32-1 at 99–126, there are a multitude of formatting discrepancies. These discrepancies include (1) missing periods at the ends of sentences that are not present in the other transcripts, (2) every line of testimony is indented in the other transcripts but only the first line of each paragraph is indented in the unidentified individual's transcript; (3) the dates are spelled out ("August twenty fifth") in the unidentified individual's transcript but presented in numerical form ("August 25, 1995") in the other transcripts; (4) the ellipses in the unidentified individual's transcript consist of three periods with no spaces while the ellipses in the other transcripts consist of five spaced periods; (5) visibly smaller page margins on the unidentified individual's transcript; and (6) misspelling of the term "no one" as "noone" in the unidentified individual's transcript, *id.* at 64, while the proper spelling appears in the other transcripts, *id.* at 103. Other than forgery, the Court can surmise no plausible explanation for these deviations given that two of these other interviews were purportedly taken by the same individual from the same office within the same hour.

The Court also notes the unidentified security guard's abnormal degree of concern for the victim's "male companion," who was, at minimum, loitering at a mall entrance at 5:30 a.m., in the face of a young woman screaming for the police. And, as detailed above, the transcript materially conflicts with the other evidence of record.

Due to the clear and unambiguous indicia of fraud, the Court cannot find that the interview transcript suffices to excuse procedural default or demonstrates Peacher's entitlement to habeas relief on the underlying claim. The Court similarly cannot find that it serves as good

cause to conduct discovery, nor is it necessary to hold an evidentiary hearing to assess the authenticity of the interview transcript upon which Peacher relies.[6] Because Peacher could not satisfy the actual innocence standard even after discovery and the presentation of evidence at an evidentiary hearing and because the interview transcript is a forgery, the Court denies the habeas petition.

APPOINTMENT OF COUNSEL

Peacher also filed a motion to appoint counsel. ECF No. 31. The Criminal Justice Act, 18 U.S.C. § 3006A(a)(2)(B), permits the appointment of counsel in a habeas corpus case, if "given the difficulty of the case and the litigant's ability, [he] could not obtain justice without an attorney, he could not obtain a lawyer on his own, and he would have . . . a reasonable chance of winning with a lawyer at his side." *Winsett v. Washington*, 130 F.3d 269, 281 (7th Cir. 1997) (cleaned up).

Though Peacher maintains that he cannot litigate this habeas case on his own, his filings demonstrate his ability to form cogent arguments, to cite relevant law and evidence, and to respond appropriately to court orders. Moreover, the Court does not perceive that assistance of appointed counsel would have resulted in a different outcome in this habeas case. The Court denied the habeas petition through consideration of the arguments and meticulous review of the record rather than due to poor presentation in the petition and in the traverse. Therefore, the motion for appointed counsel is denied.

---

[6] At this time, the Court stops short of finding or seeking further development on the issue of whether Peacher forged or conspired to forge the interview transcript or whether he submitted it with intent to defraud the Court. Nevertheless, if the Court had made such a finding, the resulting sanctions could have served as an alternative basis for dismissal. *See Jackson v. Murphy*, 468 F. App'x 616, 620 (7th Cir. 2012) ("A court may punish particularly egregious misconduct by dismissing a case without advanced warning."); *Bolt v. Loy*, 227 F.3d 854, 856 (7th Cir. 2000) ("Even without a warning, egregious misconduct can be punished by dismissal.").

<u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to Section 2254 Habeas Corpus Rule 11, the Court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Peacher to proceed further.

For these reasons, the Court hereby DENIES the motion for counsel [ECF No. 31]; DENIES the motion for a hearing [ECF No. 33]; DENIES the motion for discovery [ECF No. 34]; DENIES as UNNECESSARY the motion to accept evidence [ECF No. 49]; DENIES the habeas corpus petition [ECF No. 2]; DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the Clerk of Court to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on October 31, 2024.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT